UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 07-40 (JDB) |
| | : | |
| v. | : | |
| | : | |
| SUNNI HAM | : | |

**GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND**
**MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court, pursuant to § 3E1.1(b)(2) of the Sentencing Guidelines, to adjust the defendant's offense level down one level reflecting the defendant's early plea of guilty in this matter, which permitted the government to avoid preparing for trial and permitted the court to allocate its resources efficiently. The United States also submits this memorandum in aid of sentencing.

**I.   BACKGROUND**

The defendant was charged in a six-count indictment with two counts of Sex Trafficking of Children, in violation of 18 U.S.C. § 1591, two counts of Transportation of a Minor for Prostitution, in violation of 18 U.S.C. § 2423(a), one count of Transportation of a Person for Prostitution, in violation of 18 U.S.C. § 2421, and one count of Simple Assault, in violation of 22 D.C.C. § 404. On April 4, 2007, the defendant pled guilty to a three count superceding Information charging him with one count of Sex Trafficking of Children, in violation of 18 U.S.C. § 1591, one count of Pandering, in violation of 22 D.C.C. § 404, and one count of Simple Assault, in violation of 22 D.C.C. § 404. At that time the defendant admitted to the following: in May of 2006, the defendant recruited two girls (C.P., a seventeen year-old, and S.H., a sixteen year-old) from Baltimore Street

in Baltimore, Maryland, to come with him to the District of Columbia to engage in sex acts in exchange for money. The defendant knew that C.P. was seventeen years old, and he knew that S.H. was sixteen years old. The defendant also prostituted T.T., an adult female, at the same time he was prostituting C.P. and S.H.

C.P., S.H., and T.T. lived with the defendant at his house in Maryland while they were prostituting for him. The defendant purchased skimpy outfits for C.P. and S.H. to wear while prostituting, and instructed them on how to behave when he put them out to prostitute on the streets of the District of Columbia. He also brought C.P. and S.H. to meet his mother, a former prostitute who provided C.P. and S.H. with additional skimpy attire. Between May 1, 2006, and May 19, 2006, C.P., S.H., and T.T. stayed at the defendant's house during the day. In the evenings, the defendant picked up C.P., S.H., and T.T. from his home in Maryland and drove them to the "track" in D.C. -- an area around the 1800 block of Rhode Island Avenue, NW, known for prostitution. The defendant instructed C.P., S.H., and T.T. to charge $150 for "everything," $75 for oral sex, and $100 for vaginal sex. C.P., S.H., and T.T. each engaged in sex acts in the District of Columbia, including, but not limited to, the penetration, however slight, of the anus or vulva by a penis, contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus, in exchange for money. C.P., S.H., and T.T. gave the defendant all the money they earned from these sex acts. By driving C.P., S.H., and T.T. from Maryland to the District of Columbia to engage in commercial sex acts, the defendant affected interstate commerce.

On May 23, 2006, Ham assaulted T.T. for not making her quota of $400 for that morning. T.T. had visible injuries to her face and mouth as a result of this assault. These injuries were witnessed and documented by a Metropolitan Police Department Detective. On May 25 and 26,

2006, T.T. made controlled telephone calls to the defendant. Those calls were recorded by law enforcement. When T.T. asked the defendant if he would hit her again, he said he would if she got "on [his] nerves." In the May 26, 2006 phone call, the defendant admitted that he had three new "girls."

At the time of these offenses, the defendant had criminal convictions for assault with a dangerous weapon and carrying a pistol without a license in D.C. Superior Court Case F-850-02. The defendant was also on probation in case F850-02 when he committed the instant offenses, and he committed the instant offenses less than two years after release from prison in case F850-02.

**II.    SENTENCING CALCULATION**

    A    Statutory Maximums

Pursuant to 18 U.S.C. § 1591, the offense of Sex Trafficking of Children carries a maximum sentence of 40 years imprisonment, up to five years of supervised release, and a fine of up to $250,000. Pursuant to 22 D.C. Code § 2705, the offense of Pandering carries a maximum sentence of 5 years imprisonment, a fine not to exceed $1,000 and up to three years supervised release. Pursuant to 22 D.C. Code § 404, the offense of Assault carries a maximum sentence of 180 days imprisonment, and a fine not to exceed $1,000.

    B.    Federal Sentencing Guideline Calculation

The Guidelines calculations utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 27. See PSR ¶ 39. This offense level takes into account a three level adjustment for acceptance of responsibility, a two level increase pursuant to U.S.S.G. § 2G1.3(b)(2)(B) because the defendant unduly influenced a minor to engage in prohibited sexual conduct, and a two level increase pursuant to U.S.S.G. § 2G1.3(b)(4) because the offense involved

the commission of a sex act, sexual contact, and/or a commercial sex act. The PSR also includes a two level increase pursuant to U.S.S.G. § 3D1.4(a), the multiple count adjustment. See PSR ¶¶ 30 - 35. However, given that the defendant pled guilty to a District of Columbia offense as it related to the second victim, the government did not contemplate a multiple count adjustment when it negotiated the plea, and thus feels obligated to allocate for a sentence that does not add such an adjustment. So while the Court is obviously free to make its own determination of this issue, the government's sentencing recommendation will use a base offense level of 25, which does not include the multiple count adjustment. The PSR calculates the defendant's criminal history as Category III. See PSR ¶ 47. Therefore, the guideline range for the offense of Sex Trafficking of Children is calculated at 70 to 87 months.

    C.    District of Columbia Sentencing Guideline Calculation

The PSR writer also consulted the District of Columbia voluntary sentencing guidelines for count two of the information: pandering. The offense of pandering is classified as a Group 9 offense, and the defendant's guideline range for this offense is 5 to 20 months. See PSR ¶ 92.[1]

The District of Columbia voluntary sentencing guidelines do not apply to misdemeanor offenses, so the guidelines do not apply to the simple assault conviction.

### III.  GOVERNMENT'S RECOMMENDATIONS

    A.    Acceptance of Responsibility

The government agrees that the defendant's base offense level should be decreased by three

---

[1] If the Court includes the conduct from the pandering count in the application guideline for Count One, any sentence of imprisonment must run concurrent to Count One. However, as noted above, the government's calculations do not include the conduct from the pandering offense in this manner. If the Court follows the government's recommendation, the sentence for the pandering offense may run consecutive to the sentence for the federal offense.

points pursuant to Section 3E1.1 of the Sentencing Guidelines. He entered a guilty plea early enough in the proceedings to avoid the government's having to prepare for trial, and he appears to have met the requirements of Section 3E1.1 with respect to cooperating in the pre-sentence investigation. Accordingly, the government is moving the Court to grant the additional one level decrease in base offense level provided for in that Guideline provision.

### III.   Application of the Federal Guidelines post-Booker

Pursuant to the plea agreement between the government and the defendant, it is the government's position that the Court should impose a sentence within the guidelines range. In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756. However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. See 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review by courts of appeals for "reasonableness." Id. at 769.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and

correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

  The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783

(dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, 125 S. Ct. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement

of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912. A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range calculated in the Presentence Report for Count One.

    C.    Application of the District of Columbia Superior Court Sentencing Guidelines

In December 2003, the District of Columbia Advisory Commission on Sentencing recommended that sentencing guidelines be introduced in D.C. Superior Court. Such guidelines were promulgated and instituted in June 2004. The D.C. Superior Court Guidelines are, and always have been, voluntary. However, for the reasons discussed in section B above, the government respectfully recommends that the Court sentence the defendant within the D.C. Guidelines range as calculated in the Presentence Report for Count Two.

> D.     Basis for Government's Sentencing Recommendation

The defendant's criminal history and the egregious crimes he committed in this case support the government's request for a significant period of incarceration. The defendant has a history of violent behavior. He was on probation in case F850-02 when he committed the instant offenses, and he committed the instant offenses less than two years after release from prison in case F850-02. In that case, the defendant fired a .357 handgun into a vehicle.

The defendant is a violent predator, and he preys upon vulnerable teenagers. Like all sexual abuse victims, the effects of the defendant's actions on C.P. and S.H. may not be fully apparent for years to come.[2] At the hands of the defendant, the minor victims in this case experienced life as no

---

[2]     Child sexual abuse (hereafter, "CSA") is a horrible epidemic plaguing this nation's children, evidenced by disturbing studies which reveal that as many as 62 % of women have experienced CSA. See Joseph H. Beitchman, et al., A Review of the Long-Term Effects of Child Sexual Abuse, 16 Child Abuse & Neglect 101, 115 (1992). The short and long-term effects of CSA are both devastating and pervasive. The most common short-term effect can be summarized as the development of some type of inappropriate sexual or sexualized behavior. See Beitchman et al., A Review of the Short-Term Effects of Child Sexual Abuse, 15 Child Abuse & Neglect 537, 552 (1991). This behavior is marked by the child's heightened interest in and preoccupation with sexuality, and may be evidenced by sexual play, masturbation, seductive or sexually aggressive behavior, and/or age-inappropriate sexual knowledge. Id. The long-term effects of CSA are those behaviors, attitudes or opinions embodied or displayed by the victim many years after the abuse. See Vander Mey & Neff, supra. The most common long-term effect of CSA is sexual disturbance or dysfunction. See Beitchman et al., A Review of the Long-Term

child should know it. UNICEF characterizes child prostitution as "one of the gravest infringements of rights that children can endure."[3] Unfortunately, C.P. and S.H's experiences are not anomalies. Although comprehensive research to document the number of children engaged in prostitution in the United States is lacking, it is estimated that about 293,000 American youth are currently at risk of becoming victims of commercial sexual exploitation.[4] On average, girls engage in prostitution between the ages of 12 and 14 and boys between 11 and 13. Of the girls living on the street, 55% engage in formal prostitution, with 75% of these girls working for pimps.[5] Pimp-controlled commercial sexual exploitation of children is linked to escort and massage services, private dancing, drinking and photographic clubs, major sporting and recreational events, major cultural events, conventions, and tourist destinations. Once children find themselves on the street and involved in prostitution, they also become more vulnerable to exploitation through sexual assault, physical

---

Effects of Child Sexual Abuse, supra, at 103. Anxiety, fear, and depression are also commonly cited long-term effects of CSA, especially where force or threat of force was involved in the abuse. Id. Women who are victims of CSA are also more likely to be revictimized. Id. Revictimization means that adult and teenage survivors of CSA are more likely to experience abusive relationships and/or be raped due to their CSA-induced low self-esteem, idealization of men, and oversexualization. Id. at 108. Other long-term effects include: guilt, mistrust in relationships, and possibly even post-traumatic stress disorder. See David Spiegel, Suffer the Children, Society, May-June 2000, at 18, 19. Finally, adult and teenaged CSA victims are more likely to experience the following adult disorders: substance abuse, eating disorders, anxiety disorders, associative disorders, and personality disorders, all of which are highly correlated with suicidality. See John Read et al., Assessing Suicidality in Adults: Integrating Childhood Trauma as a Major Risk Factor, 32 Professional Psychology: Research and Practice 367 (2001).

[3] UNICEF. In: The progress of nations. Child rights--the ultimate abuse. New York: UNICEF, 1995.

[4] Richard J. Estes & Neil A. Weiner, Commercial Sexual Exploitation of Children in the U.S., Canada and Mexico, University of Pennsylvania (2001).

[5] S. Gottovi, *Sex Trafficking of Minors: International Crisis, Federal Response*, USA Bulletin (March 2004).

11

violence and participation in child pornography.[6]

One of the obvious concerns about prostituted children is that they are at risk of injuries, including rape, as a result of violence from pimps, clients, police, and intimate partners. Also obvious is that girls who are forced into prostitution are usually physically and emotionally abused into submission. As troubling as these obvious dangers for prostituted children are, the less obvious and potentially more serious health concerns that are ever present for children like C.P. and S.H. are equally frightening.

Prostituted children are at high risk of many infectious diseases, especially HIV and other sexually transmitted diseases (STDs). Studies have shown that prostituted children are at higher risk of STDs than their adult counterparts because their status as children makes them less able to negotiate the use of condoms by their clients.[7] "Without use of condoms, the risk of transmission of STDs is high; during one act of unprotected sex with an infected partner, an adolescent girl has a 30% risk of acquiring genital herpes simplex virus and a 50% risk of acquiring gonorrhea."[8] A final health concern for prostituted women and children, like C.P. and S.H., is human papillomavirus (HPV), which has garnered much attention of late for its close link with cervical cancer.[9] Because the risk of developing cervical cancer is associated with a high number of sexual partners and young

---

[6] *Female Juvenile Prostitution: Problem and Response (2nd Ed.)*, National Center for Missing and Exploited Children (November 2002).

[7] Brian M. Wills & Barry S. Levy, Child Prostitution: Global Health Burden, Research Needs, and Interventions, 359 Lancet 2002 1417, 1417-1422 (2002).

[8] Facts in Brief: Teen Sex and Pregnancy, 1999 Alan Guttmacher Inst.

[9] STD Facts - Human Papillomavirus (HPV), http://www.cdc.gov/STD/HPV/STDFact-HPV.htm

age at first intercourse, both C.P. and S.H., therefore, have an increased risk of cervical cancer as a result of engaging in numerous act of prostitution on behalf of the defendant.

There are also significant emotional ramifications of child prostitution. "Child prostitution often results in serious long-term psychological harm, including anxiety, depression, and behavioral disorders. Prostituted children are also at high risk of suicide and post-traumatic stress disorder."[10] One U.S. study showed that 25 (41%) of 61 pregnant prostituted adolescents reported suicidal ideation or attempts within the past year. Id.

The defendant used his position as an adult to entice vulnerable teenagers with promises of love, affection, clothing, shelter, protection, and money. The defendant was able to sway these teens into a life of prostitution which endangered them physically, mentally and emotionally. He treated them as nothing more than chattel which existed exclusively for his financial advancement. The government is requesting that this Court send a strong message that our community will not tolerate such exploitation of women and children by imposing a severe sentence. Unfortunately, offenders like Mr. Hamm are now revered in popular culture. Pimps have been elevated to near icon like status and their behavior is being revered in music, television and movies. Accordingly, those individuals who, like Mr. Hamm, may be inclined to pursue this particular life of crime as their vocation must be made aware that doing so will subject them to the most severe penalties available.

The defendant is a dangerous person. He enticed children to sell their own bodies for money and then persuaded them to give him all of their money while they did the filthy work. He used violence and threats to ensure compliance with his rules. A significant sentence will ensure that the

---

[10] Robert W. Deisher, et al., The Pregnant Adolescent Prostitute, 143 Am. J. Dis. Child. 1162, 1162-1165 (1989).

defendant is off of the street long enough to ensure that he will be unable to return to his chosen lifestyle and thereby subject other women and children to the exploitation suffered by the victims in this case.

## IV. CONCLUSION

Wherefore, the government respectfully requests that the Court sentence the defendant to 87 months for the offense of Sex Trafficking of Children, 20 months for the offense of Pandering, and 180 days for the offense of Assault. The government requests that these sentences be served consecutively, and be followed by an extensive period of supervised release. The government also respectfully requests that the defendant be ordered to register as a sex offender for a period of twenty-five years.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No. 451058

      /s/
Catherine K. Connelly
Assistant United States Attorney
Mass. Bar No. 649430
Precious Murchison
Assistant United States Attorney
Maryland Bar
555 4th Street, N.W
Washington, DC 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 07-40 (JDB)** |
| | : | |
| v. | : | |
| | : | |
| **SUNNI HAM** | : | |

**ORDER**

WHEREUPON, having considered the Government's Motion for Guidelines Credit, and the record before the court, it is hereby

**ORDERED**, that the Government's motion is hereby GRANTED.

_____
John D. Bates
United States District Judge


cc:

Catherine K. Connelly
Assistant United States Attorney
555 4th Street, NW
Washington, D.C. 20530

Shawn Moore
Assistant Federal Public Defender
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004

1